HARRY O. WHITLOCK, Defendant in Error, *vs.* JESSIE NICKERSON WHITLOCK, Plaintiff in Error.

*Opinion filed April 22, 1915—Rehearing denied June 11, 1915.*

1. DIVORCE—*when decree of divorce for adultery by wife will not be upheld.* A decree granting a divorce for adultery by the wife will not be upheld by the Supreme Court where the only specific evidence that tends to prove the charge is the testimony of a biased witness, whose story is improbable and in part clearly impossible, and is contradicted by credible witnesses.

2. SAME—*extreme and repeated cruelty means repeated acts of violence.* To justify a divorce on the ground of extreme and repeated cruelty the cruel treatment proved must be actual physical violence and be repeated, and if the charges are denied there must be some evidence of such acts in addition to the testimony of the complaining party.

DUNN, COOKE and WATSON, JJ., dissenting.

WRIT OF ERROR to the Branch "D" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. WILLIAM E. DEVER, Judge, presiding.

DAVID K. TONE, (WILLIAM E. MASON, and LEWIS F. MASON, of counsel,) for plaintiff in error.

SHORT, DAVIS & RUST, (BURKHALTER & GROSSBERG, and WALLACE STREETER, of counsel,) for defendant in error.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Defendant in error (hereafter referred to as complainant) filed his bill in the superior court of Cook county on December 22, 1911, against plaintiff in error (hereafter referred to as defendant) for divorce. The bill charged defendant with having committed adultery with Dr. O'Byrne, the family physician of the parties to the suit, on September 21, 1911, and at divers other times. Defendant answered the bill denying the charge of adultery and filed a

cross-bill for divorce charging her husband with extreme and repeated cruelty. The husband filed an answer denying the charge in the cross-bill. Replications were filed and the cause was heard by the court without a jury, resulting in a decree finding the defendant in the original bill guilty of adultery as charged and awarding the complainant in the original bill a divorce upon that ground. The cross-bill was dismissed for want of equity. On appeal to the Appellate Court for the First District the decree was affirmed, and the case is brought to this court upon a writ of *certiorari*.

It is assigned for error that the Appellate Court erred in affirming the decree of the superior court finding that subsequent to her marriage the defendant committed adultery and decreeing a divorce on that ground and dismissing the cross-bill for want of equity, and that such decree is contrary to the evidence. As the decision of the case depends entirely upon the evidence and the question is altogether one of fact we have examined the record closely, the honor and good name of both parties to the suit and that of their children being involved.

The parties were married March 1, 1908. Their first child was born on November 24, 1909, and the second on March 24, 1911. Dr. O'Byrne attended defendant at the birth of the first child and continued as the family physician from that time until subsequent to the date of the alleged adultery. After the marriage the parties lived on South Forty-fifth avenue, in Chicago, until about May 1, 1910, for the next year on Washtenaw avenue, and from about May 1, 1911, until after their separation, in a flat-building on West Adams street which was owned by the mother of complainant and who lived in the upper flat of the building, complainant and defendant and their children occupying the lower flat. The material witnesses on behalf of the complainant were himself, his brother, William, and his mother. The complainant testified that at the time of

the birth of their first child, and about an hour after the child was born, he stepped into the bed-room, where Dr. O'Byrne was alone with the defendant, and found him patting. her cheek and calling her endearing names. On June 20, 1910, he came home and entered the house quickly and found the defendant with her face flushed, her hair mussed up and holding her hands behind her back, and that she confessed afterwards that she was hiding the doctor's gloves behind her back, and that he had left by the back door through the basement as complainant came in at the front. In June, 1911, the complainant came home sick, affected by the heat, as he says, and saw the doctor getting up from a couch where his wife was lying, in the bed-room. On that occasion the doctor ministered to the complainant, putting him to bed and placing cracked ice on his head. On September 24, 1911, the complainant discharged Dr. O'Byrne for the reason that his treatment of the baby was not satisfactory and another physician was called. On October 28, 1911, after a conversation with his mother, he claims that the defendant confessed to having had improper relations with Dr. O'Byrne at different times, and subsequently, on the same evening, admitted the same thing in the presence of her father and mother, who lived in the neighborhood and who had been sent for to bring over an anonymous letter the defendant's mother had received. The brother of the complainant, William Whitlock, also testified that she repeated this confession in the presence of the complainant and himself on November 18, 1911. These admissions and alleged confessions were denied *in toto* by the defendant and by her father and mother, who were present on October 28 when it was claimed they were first made, and their testimony puts the matters that were there discussed in an entirely different light. There is evidence of some of the neighbors that Dr. O'Byrne was a frequent caller at the Whitlock house and at other houses in the neighborhood where he had patients. The mother

of the complainant testified that in the latter part of June,
1911, she was in the parlor of the flat occupied by com-
plainant and defendant, when Dr. O'Byrne drove up in his
automobile. The defendant let him in at the front door.
Opposite the door was a picture hanging on the wall with
a black background, in which the witness claimed she could
see the reflection of the defendant and the doctor. She
testifies: "I saw him raise his hand as though he was
about to embrace her, and I heard her say, 'Harry's mother
is here.'" On another occasion she came in the flat un-
expectedly with a neighbor and saw Dr. O'Byrne kissing
defendant in the hall. The neighbor who accompanied her
(Mrs. Morris) was also a witness and corroborated this
story to the extent of coming into the flat with the com-
plainant's mother and meeting the doctor, who was there
on a visit to the sick baby, but saw nothing of the kissing.

The only direct evidence to sustain the charge of adul-
tery in the bill was that of the mother of complainant, who
testified that on September 21, 1911, between eleven and
twelve o'clock in the forenoon, while she was in her flat
above the one occupied by the defendant, she heard the
doctor and the defendant come out on the back porch of
the flat, which was screened in and where the baby was
asleep, and then go back in and lock the door. Shortly
after she heard the door-bell ring and went down to the
entrance, which was used for both flats. A woman was
there inquiring where someone lived and asked if anyone
was sick. The witness saw no one in the defendant's flat
excepting the older child. She went back up-stairs to her
flat and went down the back way. There was a man just
leaving the porch, who inquired if she wanted the baby's
picture taken. She thought the man had been in the hall
and left the door open. She went down the back stairs on
to the screened porch in the rear of defendant's flat, saw
the younger baby asleep in the hammock, tried the door
leading into the northeast room of the defendant's flat and

found it was locked. The flat-building faces to the south and the porch is on the north side of the flat. There are two rooms in the north end of the flat, next to the porch. The east room is the larger of the two and is connected with the porch by a door, and east of the door opening onto the porch are two windows close together. The west room has no windows opening onto the porch. There is a door between the two rooms. To look into the west room from the porch windows it is necessary to look through the door connecting the two rooms. There was a cot in the southwest corner of the west room. The witness first testified that she looked through both of these windows in passing along the porch and saw the defendant in the act of committing adultery on the cot in the west room with Dr. O'Byrne. Her testimony was as follows: "When I first looked into the window I looked south over the sash curtain of the east window and then I looked over the sash curtain of the west window, where the glass was broken out. I could see this couch from both places just as I have described it. * * * I looked into the east window first. From the east window I could see the doctor below the hips, and also the head. When I went to the west window I could see about as much of the doctor but not quite. As I told you, there is a six-inch difference in the space. It would make about that much difference. I was not in the center of that west window but to the east side of it. I did not have to go to the west window. I just had to move a few inches. I went to the west window and looked in there where the glass was broken. There was only six inches difference in what I could see from that window." Later on she corrected her testimony and claimed that she saw this episode through the east window and did not try to look through the west window. Still later she testified that she did see the head and shoulders of the doctor and the defendant through the west window. A plat of these rooms and porch, with measurements showing the

dimensions, is in the record, together with lines of sight from the two windows into the west room, in which the alleged adultery took place. From the plat, the sight lines and the testimony of the architect who made the plat it appears that from the east side of the east window a person standing on the porch could see a portion of the cot but that it was impossible to see more than a corner of the cot through the door between the rooms from the west window. It further appears that after the witness testified as to what she saw through the west window, and before she went on the witness stand and corrected her former testimony, a reporter had called at the house and examined the premises, and he and others had attempted to verify her testimony but were unable to see from the west window the space formerly occupied by the cot and had called her attention to that fact. It further appears that the witness had a key to the flat occupied by the defendant and her husband and had access to it at all times.

The story told by the above witness is at least an improbable one. To sustain this decree we must believe that the parties went into the room in question and without even taking the precaution to close the door or pull down the window shades committed a gross act of adultery in broad daylight, in premises that were accessible to two families and where they could be seen by anyone around the premises. There is other testimony in the record which tends to cast a grave doubt upon the motives of the complainant in bringing this suit and the part taken therein by his principal witnesses,—his mother and brother. About the time of the occurrences above set out certain anonymous letters were written,—one of them to the mother of the defendant,—and it was this letter that caused the father and mother of the defendant to be called to the flat of the complainant and defendant on October 28. We infer from the record that this letter was printed, but from certain figures in the letter similar to the same figures made by

Mrs. Whitlock, Sr., and the mis-spelling of certain words peculiar to her as shown by the evidence, and the further evidence in the record that she called attention to these anonymous letters and denied having written them before she was accused of so doing, there is a strong suspicion that she was the author of these letters despite her denial of being the author. Another circumstance that is shown by the record is that complainant, some time in the latter part of October, or in November, 1911, through his brother, William, procured the services of an attorney and took steps to bring an action against Dr. O'Byrne for damages for alienation of the defendant's affections, and conferences were held between him and the attorney of Dr. O'Byrne, who denied having been guilty of any impropriety and refused to pay. William Whitlock at first testified that the first he knew of the trouble between the parties was when he called at their flat on November 18, and yet it seems he had been active in procuring the services of an attorney for the complainant at least two weeks prior to that time, and, incidentally, as early as November 4 had procured the report of a commercial agency on the financial standing of Dr. O'Byrne. There is also the evidence of a witness who lived across the street from the Whitlocks, and who was entirely disinterested, that Mrs. Whitlock, Sr., had offered her money to testify against the defendant.

Aside from the evidence which we have detailed there is nothing whatever in the record which is against defendant in any way. She was unquestionably a young woman of education and refinement and of a good family. Her parents, while not wealthy, are respectable and honest people and have properly stood by the defendant in her trouble. The defendant, at the time of her marriage, was in the employ of the United States civil service commission at a salary of $1000 a year,—a position that is not generally held by wantons or women of loose character. She had a high school education and is a graduate of the Art Institute,

had saved money, and spent a large part of it in furnishing her home when she married the complainant. She denies absolutely any impropriety with Dr. O'Byrne or having admitted to the complainant or anyone else any improper conduct with him, and her testimony as it appears in the record, as well as that of her parents and Dr. O'Byrne, is convincing. The defendant and her parents directly contradict the complainant and his brother as to the alleged admissions of infidelity, and their account of what occurred is a reasonable one. The language and profanity imputed to the defendant in these alleged admissions is entirely at variance with her conduct and demeanor as shown by disinterested witnesses. There are no property interests involved in this litigation. The defendant has little, if anything, to gain in a financial way in the outcome of the suit. It is not often that a party to litigation of this character, unless honest and actuated by the best of motives, will go to the extent the defendant has gone in this case to protect and preserve her good name. Dr. O'Byrne was a physician residing in that neighborhood. He was called to attend the defendant in two cases of confinement and to attend the children afterwards. The younger child was sick much of the time after its birth, and it is very evident from the record that the attendance of the doctor was necessary. The young wife and mother was having a hard time and should have had the sympathy and support of her husband's relations instead of their unconcealed hostility and aversion. The doctor attended the defendant and her children the same as any other physician would attend them, made his charges for such services and rendered his bills to the complainant, who paid them. It is true the defendant and Dr. O'Byrne were at times alone together in the defendant's home, but his attendance as a physician being necessary, there is nothing in that circumstance, alone, from which guilty intimacy could be implied. To hold otherwise would be to put a perverted and wholly unwar-

ranted construction upon many of the necessary and proper ministrations of the medical profession. The testimony of the complainant contains many innuendoes and reflections on the character of the defendant, but there was nothing within his actual knowledge on which to base such testimony, and it is clear that from anything he actually saw or knew he had no suspicion of any improper relations between his wife and Dr. O'Byrne until long after the doctor was discharged and his mother had told the preposterous story she subsequently testified to. Then everything he had ever noticed was seen·by him in a different light. As an instance of this, at the time of the first act of impropriety of which complainant testified, (the occasion when their first child was born,) the defendant, as complainant further testified, was under the influence of anæsthetics. As said in *Carter* v. *Carter,* 62 Ill. 439, on page 449: "When the evidence may as well establish innocence as guilt the jury should always adopt the former rather than the latter hypothesis; and the same is manifestly true where a violation of the marital rights is charged by the commission of an act that degrades the parties and inflicts great wrong upon society. When such a charge is made it involves the character of both parties to the offense, and the character of the woman, to whom it is of priceless value. She should not be found guilty on evidence which may as well import innocence as guilt." In *Chestnut* v. *Chestnut,* 88 Ill. 548, the same rule is laid down.

We are mindful of the rule that a court of review will not disturb the findings of fact of a chancellor unless such findings are clearly and palpably against the evidence, particularly where the chancellor has seen the witnesses and heard them testify and is in a better position to judge of their credibility than the upper court. Still, where the only specific evidence that tends to prove the charge in the bill is that of a witness who could not possibly have seen what she claims she saw and her testimony is contradicted by

credible witnesses, the evidence is not sufficient to justify the decree and it is our duty to reverse such decree.

We are cognizant of the authorities cited by complainant in support of the above proposition that the holding of the lower court should not be disturbed unless contrary to the evidence, and without reviewing them here it is sufficient to say that there has been no case decided by this court of which we are aware or that has been cited, in which a charge of adultery has been sustained on contradicted evidence of such character as is contained in the record in this case. In the case of *Jenkins* v. *Jenkins,* 86 Ill. 340, this court reversed a decree for divorce granted for adultery of the defendant where the only evidence of the adultery was that of the complainant, and her testimony was improbable in its details and the defendant and the corespondent denied the charge. In the case of *Berckmans* v. *Berckmans,* 16 N. J. Eq. 122, the facts were very similar to those in the case at bar. The husband sued his wife for divorce on the ground of adultery alleged to have been committed with her family physician. The mother-in-law testified to seeing the act through a window. After sight lines had been projected demonstrating that she could not have seen what she swore to from the point where she stood, she changed her testimony. The court, in rejecting her evidence for this among other reasons, said, on page 129: "It shows that what she originally swore she saw was a physical impossibility, and that after that fact had been ascertained her evidence was so modified to meet the emergency as to render it of little or no significance."

As to the cross-bill filed by the defendant charging the complainant in the original bill with extreme and repeated cruelty, the defendant testified to two acts of cruelty and physical violence by the complainant. To justify a divorce on the ground of extreme and repeated cruelty the cruel treatment proved must be actual violence and it must be repeated. What would amount to extreme and repeated

cruelty depends largely upon the facts and circumstances of each particular case. (*Ward* v. *Ward,* 103 Ill. 477.) There is some corroboration as to one of the alleged acts, but the evidence, for the most part, is entirely that of the defendant, and the complainant denied her charges. There should be evidence of such acts as would constitute sufficient cause for divorce under the circumstances besides the evidence of the party to the suit who makes such charges, where such acts are denied. This evidence is lacking, and we do not feel justified in reversing the finding of the chancellor or the judgment of the Appellate Court on the decree, on the cross-bill.

For the reasons given, the judgment of the Appellate Court and the decree of the superior court will be reversed and the cause will be remanded to the superior court.

*Reversed and remanded.*

DUNN, COOKE and WATSON, JJ., dissenting.