Laura May Jackson, Appellee, v. Nicholas J. Jackson, Appellant.

Gen. No. 9,273.

Opinion filed March 31, 1938.

RAYMOND J. HARVEY and PENCE B. ORR, both of Joliet, for appellant.

BASKIN & MILLER, of Joliet, for appellee.

MR. JUSTICE WOLFE delivered the opinion of the court.

The appellee, Laura May Jackson, filed her complaint for divorce in the circuit court of Will county, November 25, 1936, in which she alleges the date of her marriage to be September 14, 1936, and that she and her husband lived together until November 25, 1936.

The fourth paragraph of the complaint is as follows: "That since said marriage and during all the time plaintiff lived and cohabited with the said defendant she has treated him kindly and affectionately, and in all things at all times conducted herself toward the said defendant in a manner well becoming a good, true and virtuous wife." The fifth paragraph is as follows: "That subsequently to their intermarriage, and wholly regardless of his marriage vows and obligations as a husband, the defendant has been guilty of extreme and repeated cruelty toward the plaintiff; that is to say, on divers days and times since their marriage, the defendant has beaten, struck, kicked and choked the plaintiff, and particularly on, to-wit, the month of October, at Joliet, Illinois, the defendant, without provocation and in anger struck the plaintiff on her face and body with his fists, hurting her severely, causing bruises and the blackening of her eyes; and on, to-wit, the 25th of November, A. D., 1936, without provocation and in anger shoved, pushed, struck and beat the plaintiff, and ordered said plaintiff from their home, and on each of said occasions and numerous other occasions has used toward the plaintiff the most obscene, profane and opprobrious language, rendering her life miserable and placing her in fear of her natural life."

The bill then prays that the parties may be divorced, and that the defendant be ordered to pay the costs of the suit, including a reasonable attorney's fee, and that he pay alimony to the wife.

To this complaint the defendant filed an answer denying that he at any time struck, beat, or choked the plaintiff, or otherwise mistreated her. The defendant also denied that his wife had always conducted herself kindly and affectionately toward him, and had been a good, true and virtuous wife; but charged that frequently she stayed out all night away from their home; that she, without cause, had frequently left his home and stayed away 2 or 3 days at a time and refused to tell her husband where she had been.

The defendant filed a counterclaim against the plaintiff and asked for a divorce from her on the ground of adultery, and also acts of extreme and repeated cruelty by the wife toward himself. He charges that on one occasion she twisted his arms severely and broke his little finger on his right hand, causing him great pain and suffering; that she threw the receiver of the telephone at him and struck him on the head causing a cut an inch or an inch and a half long over his left eye; that on October 31, 1936, his wife had been absent from their home for several days, and that the defendant sought to find her but could not; that the plaintiff violently shoved the defendant and knocked him down, causing him to strike one of his elbows against the railing of the bed; that it bled profusely and bruised the tissues; that on October 28, 1936, in a fit of anger, and without any reasonable cause, she seized a pestle and hit the defendant on the back of his head, cutting his head and causing it to bleed profusely; that the said blow caused a scar which was still visible at the time of filing the counterclaim. He alleges that in the month of September, 1936, Laura May Jackson, committed adultery—the name of the man was unknown to the defendant—and that he did not learn of the act of adultery until subsequent to the time that the plaintiff deserted him on November 25, 1936.

The plaintiff filed her answer to the cross-complaint. The case was heard by the court, who found the issue

in favor of the plaintiff, and dismissed the defendant's counterclaim, and granted the plaintiff a divorce. He allowed her $1,500 as support money, and $1,000 as attorney's fees. It is from this judgment that the case is brought to this court for review.

Laura May Jackson was called as a witness in her own behalf, and testified that she and the defendant were married on August 14, 1936; that she lived with her husband until November 25, 1936; that there were no children born to the marriage: "As a wife I was true to my husband and good to him"; that after their marriage, the first trouble she had with her husband was in October, when he woke up at 3:00 o'clock in the morning and hit her. "He hit me in my face and it made a bruise on my face. I had a black-eye for two weeks; it sure did cause a discoloration. There was no discoloration on my body. He kicked me and I was compelled to leave my bed and room on account of it. He ordered me out of the bed and I got out of my bed and spent the rest of the night in my living room. I slept in there. Another occasion when I had trouble with Dr. Jackson was on October 31, 1936." She then told in detail about some trouble she had with the doctor in which he threatened to shoot her, but no act of physical violence was detailed on this occasion.

She further testified that he—meaning Dr. Jackson—on the 25th of November, "woke me up at three o'clock in the morning and made me get out of bed. I could not very well go then because I did not know where to go, so I slept in the living-room until six o'clock. He woke me up and I left then, and came back at eight o'clock to get my clothes, and we had a quarrel." She details about going to call the police, and concludes with the statement: "As to the reason for the fight that night of November 25, he was mad and pushed me and beat me and kicked me out of bed. I was sick and he was drunk and he wanted to mess around.

That is the reason he wanted me to get out of the bed. I left that day; I have not lived with him since.''

With the exception of the corroboration of appellee's testimony as to what happened on the night of October 31, in which the shooting episode was narrated, there was no testimony in the record whatever to corroborate Mrs. Jackson in the charge of cruelty by the husband. The bruises that she claimed were inflicted upon her by her husband, no one saw. On the night of November 25, in which she stated her husband pushed, beat, and kicked her out of bed, there is no evidence whatsoever that she was injured in any particular. In her direct testimony she says that on the occasion when her husband beat her and that she had a black eye for two weeks, and ''it sure did cause a discoloration.'' In her cross-examination she states positively that she did not have a black eye.

It will be observed from the reading of the bill of complaint that there are only two acts of cruelty charged against the defendant. There is no charge that the defendant attempted to kill the plaintiff. The question arises, whether the plaintiff established her case, by a preponderance of the evidence, that her husband was guilty of extreme and repeated cruelty as described in our Divorce Act. In the case of *Moore v. Moore,* 362 Ill. 177, the plaintiff, Hazel Moore, sued her husband Lloyd Moore for a divorce on the charge of extreme and repeated cruelty. It seems to us the facts in the *Moore* case make out a stronger charge of cruelty than Mrs. Jackson has made against her husband in her divorce suit. The court in their opinion say, ''Cruelty constituting ground for a divorce under our statute means physical acts of violence, bodily harm or suffering, or such acts as endanger life or limb or such as raise a reasonable apprehension of great bodily harm. Bad temper, petulance, rude language, want of civil attentions, angry and abusive words, do not con-

stitute extreme and repeated cruelty within the statute.''

From an examination of this record it is our conclusion that the plaintiff has not made out such a case as would entitle her to a divorce from her husband.

As before stated, the plaintiff alleged in her bill that she at all times had treated her husband kindly and affectionately, and had conducted herself toward her husband in a manner well becoming to a true, affectionate and virtuous wife. The burden of proof was on her to show that she had so conducted herself, but the only evidence which she produced as how she treated her husband, was her own testimony. She says, ''I have treated my husband good.''

The testimony of defendant and his witnesses is of such nature that even if the defendant had not filed a cross-complaint for divorce, it would be sufficient to bar the action of the plaintiff in getting a divorce because it shows conduct that was far from the conduct of the ordinary ''true, affectionate, and virtuous wife.''

John Faye, defendant's witness, testified that he saw Mrs. Jackson coming from the rear of the hall of an apartment hotel; that there were various rooms along the hall, and that she came with a gentleman, and as she came by the witness she appeared to be nervous and excited; that she and the gentleman appeared to be going out. He was flushed up a little and appeared to be in a hurry to get out; that as she walked up to the witness she said, ''I suppose my husband will know about this?'' The witness answered, ''No, not necessarily.''

The witness, Londus Brannon, a practicing physician, testified that he knew Dr. Jackson; that on the 25th of November, 1936, Dr. Jackson came to him for treatment; that there was a wound or contusion on his forehead, a bruise on his left elbow, and the first and second bones of the little finger on his right hand were

fractured; that he treated the doctor for these wounds, and that in his opinion the wounds on Dr. Jackson's head were caused by a blunt instrument.

William Corrigan testified that he was acquainted with the Jacksons; that Mrs. Jackson would come in the tavern where he was working and make frequent telephone calls; that he had often seen Mrs. Jackson intoxicated; that he was present one evening on the porch of Dr. Jackson's home when Mrs. Jackson was intoxicated. The doctor asked her to come in and she started fighting him; she started to cry and was lying on the bed and on the floor; that he had heard Mrs. Jackson make dates with other men besides her husband; that she made them over the telephone; that he had telephoned Mrs. Jackson himself, under an assumed name, and had made dates with her.

George Smoiver testified that he knew the Jacksons and had observed the conduct of Mrs. Jackson; that he was at the lunch room about 10:00 o'clock at night and saw Mrs. Jackson go out with another fellow, not her husband. He saw her go across the street to the National Hotel, and that she was there about one-half or three-quarter's of an hour; that she went back to the National Lunch and was in there about 15 minutes and then came out with another fellow and went back to the same hotel; that on these occasions she was dancing and drinking, and that she was drunk; that after the separation he saw Mrs. Jackson out at the same restaurant about 1:00 o'clock in the morning sometime in April, and that she and her friend Judy got into a car with some fellows, and in the witness's opinion, Mrs. Jackson had had too much to drink. At another time about 3:00 o'clock in the morning, Mrs. Jackson and Judy Vanisco came down Cass street to Chicago street, and Mrs. Jackson was drunk. At another time in March, 1937, along about 1:00 o'clock in the morning, he saw Mrs. Jackson and her girl friend get into a car

with their boy friends, and he observed that Mrs. Jackson was drunk; that he had observed Mrs. Jackson at other times, as late as 1:00 o'clock in the morning, getting into cars with men not her husband. The witness further testified that on or about November 14, 1936, Mrs. Jackson took $20 out of the money drawer in defendant's tavern and lost it in a slot machine; that the witness asked her to put the money back, and after a discussion about the money and the doctor finding it out, she invited him to go to a back room with her; that he did go to the back room with Mrs. Jackson and there had sexual intercourse with her; that the doctor never did know anything about the money or he had never told the doctor about having intercourse with Mrs. Jackson until the hearing of the case.

Dr. Jackson testified in his own behalf and stated that during the month of September, Mrs. Jackson was away from home every night during the month and would come in between 11:00 and 2:00 o'clock; that as far as treating him as a true and affectionate wife— that she never prepared any meals for him, that she never ate any meals with him except when her relatives were with them; that on or about October 28, 1936, he went to bed about 12:00 o'clock; that he got up about 2:00 o'clock and heard a noise, and could see somebody had brought his wife home; that this man was loving, hugging, and kissing his wife, and doing every thing that goes with it. When Mrs. Jackson came in he asked her where she had been and she replied, ''It is none of your God damned business where I was, you God damned fool.'' Then follows the doctor's version of the occasion as related by the plaintiff in her testimony in which the doctor shot through the door. Doctor Jackson further testified that his wife pushed him against the bed and his elbow struck on the bedstead; that it broke the skin on his elbow and it was bleeding and very sore. ''There is a scar on it now.''

(The doctor then exhibited the scar on his elbow to the court and lawyers.) The doctor further testified that on the night of November 25, 1936, he saw his wife sitting on Charley Johnson's lap. They were in the kitchen of the defendant's home; that Johnson was squeezing and hugging his wife; that he then went to bed and wanted his wife to come to bed and she ordered him out the house. He narrated some actions on the part of the wife which would not look well in print and we do not care to repeat them. But, if it is true, to say the least, it was very unladylike.

The doctor further testified that about 10:00 o'clock one morning he was lying on a bed at his home and his wife entered the house through a window. He said that his wife called him names which were foul and vile, and this is the time when he states, and has charged in his counterclaim, that his wife grabbed his right hand and twisted it and broke his little finger; that she threw the telephone receiver at him and hit him upon the head. After this incident he claims he went to see Dr. Brannon to have his wounds treated. He denied in this testimony that he ever struck, beat, wounded, or ill-treated his wife. Dr. Jackson also testified that at Charles Marchio's place his wife kicked him on the shin; that he still had the scar on his shin as a result of that injury, and he exhibited the same to the court. There are other acts of misconduct related by Dr. Jackson about his wife, but space will not permit a discussion of all of them.

At the conclusion of the defendant's testimony, he, through his attorney, offered an amendment to the cross-complaint relative to the act of adultery as testified to by the witness Smoiver, so as to make the allegations of the cross-complaint conform to the proof, and also to change the date of one act of cruelty charged by the defendant against the plaintiff. The court allowed the amendment as to the date of the act of

cruelty, but overruled the motion so far as alleging adultery as testified to by the witness Smoiver.

We think the trial court erred in not allowing this amendment. The statute expressly provides that where an amendment is germane to the original bill and is presented for the purpose of making the allegations of the bill to comply with the proof, then the court's refusal to grant such amendment constitutes an abuse of the trial court's discretion if he does not allow the amendment.

After the cross-complainant had finished his testimony and the motion to amend denied, Mrs. Jackson was again called as a witness. She denied that she was guilty of any act of adultery, or that she had gone with any man to a hotel, or that she was guilty of any misconduct. A review of the evidence as submitted by Dr. Jackson and his witnesses, and the testimony of Mrs. Jackson and her witnesses, convinces this court that the evidence preponderates strongly in favor of the fact that Mrs. Jackson has been proven guilty of the charge of adultery. The evidence also preponderates in favor of Dr. Jackson that Mrs. Jackson was cruel to him on two or more occasions.

There are numerous other errors assigned, such as the court excluding certain proper evidence offered by the appellant and numerous other rulings of the trial court during the progress of the trial. But owing to the conclusions we have reached in regard to the facts disclosed by the evidence in this case, it is not necessary to pass on other assignments of error.

The appellee has filed a cross-appeal, and states that the trial court erred in fixing the alimony and attorney fees. For Mrs. Jackson the sum of $1,500, and the solicitors fees $1,000; but says that the court should have fixed $10,000 as alimony and $4,000 as solicitors' fees. It also becomes unnecessary for us to pass upon the errors assigned upon this cross-appeal, as it is our

opinion that Laura May Jackson is not entitled to a divorce.

The order of the circuit court of Will county, granting Laura May Jackson a divorce and allowing her alimony of $1,500, is hereby reversed, and the order overruling the motion of the defendant to amend his counterclaim, and dismissing the counterclaim for want of equity is hereby reversed and the case remanded to the Will county circuit court with directions to the trial court to allow the amendment as offered to the cross-complaint, and grant the cross-complainant, Nicholas J. Jackson a divorce as prayed for in his cross-complaint.

*Reversed and remanded with directions.*