(No. 24579.—

LYDIA E. WESSELHOEFT, Appellee, *vs.* HENRY J. WESSELHOEFT, Appellant.

*Opinion filed October 13, 1938.*

IRVING EISENMAN, and HUGH E. JOHNSON, for appellant.

ROBERT E. CANTWELL, JR., and MARTIN W. GROSSE, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Henry J. Wesselhoeft appeals from a decree of the superior court of Cook county awarding his wife, Lydia E. Wesselhoeft, a divorce, with an adjudication of property rights, and from an order denying a motion to vacate the decree and for a new trial.

Appellee's amended complaint charges extreme and repeated cruelty, habitual drunkenness and desertion; the loan and payment for appellant's benefit of between $25,000 and $30,000; prays for divorce, the return of the money advanced and for general relief. Appellant's counter-claim charged desertion by appellee. The decree dismissed the counter-claim for want of equity and granted appellee a divorce on the grounds of desertion and extreme and repeated cruelty. The parties owned, as joint tenants, a summer home at Lake Geneva and a residence on Menard avenue in the city of Chicago. The decree awards, in severalty, the Menard avenue property to appellant, and the Lake Geneva home, with the furnishings of the Menard avenue

property, to appellee, and requires the execution of the necessary documents to effectuate the decree. It further orders appellant to turn over to appellee 60 shares of stock in the First National Bank of Chicago, or in lieu thereof, $18,000, in cash, and to pay appellee $1500 for the solicitor's fees. By cross-errors appellee claims the chancellor should have found appellant guilty of habitual drunkenness and should have awarded her a larger amount of money or property.

Appellant has filed a motion in this court to strike the supplemental abstract and the brief and argument of appellee on the ground that they set out some of the testimony by questions and answers instead of in the narrative form. We observe no infraction of rule 38 or rule 39 that would justify granting the motion, and it is denied.

The parties were married in 1908 at St. Louis, Missouri. No children were born of the marriage. Appellee has a daughter, Alice, by a former marriage. They lived at the home of appellant's mother in St. Louis until her death in 1916. Appellee inherited nine unincumbered pieces of St. Louis real estate, 150 shares of stock in the Bremen Bank of that city, and about $30,000 in first mortgages on St. Louis property. Her net income was between $600 and $700 per month. At the time of the marriage appellant had some bonds at the face value of $2000 and a parcel of vacant real estate in St. Louis. While the parties lived there his earnings were small. Prior to the death of appellee's mother, he worked as a bricklayer for seven or eight months at $33 per week. In 1912, appellee's mother accompanied the parties on a trip to Europe, and brought home a child, Gertrude Ashpach, who lived in the family until the parties separated on April 7, 1936. Since that time she has resided with appellee.

In 1917, appellant acquired the interest of his sister's deceased husband, William Schridde, in a manufacturing business in Chicago. Appellee loaned him $2800 of the

purchase price which he subsequently repaid. The family moved to Chicago in 1918. Appellant's salary from the business was progressively increased from $25 per week until it amounted to $100 per week in 1933 or 1934. The home on Menard avenue was purchased in 1919 for $10,000. Appellant paid $4000, in cash, and assumed a mortgage of $6000 which he later paid. Appellee paid some taxes and interest on the mortgage and also paid for the furnishings. The Lake Geneva property was acquired in 1935 for $11,000, of which appellant paid half. Appellee paid the other half, borrowing $4500 from her daughter's husband for this purpose.

Appellant admits striking appellee on July 15, 1913. He claims he struck her because of her nagging and scolding. Provocative, abusive or insulting language, or even threats without some overt act, do not justify an assault or mitigate its consequences. (*Cummings* v. *Crawford,* 88 Ill. 312; *Sorgenfrei* v. *Schroeder,* 75 id. 397.) The evidence shows that on that occasion appellant struck appellee on the head with such violence as to leave a dent which still exists. She screamed, grew hysterical and struck at him with a bowl. Gertrude ran for a policeman but appellant was gone when they returned.

The second act complained of is alleged to have taken place on the night of October 15, 1928. Appellee testified that she and Gertrude came into the house while appellant was talking with a Mr. March about the stock market; that when he discovered them he ordered them to get out and shoved them against a chair, hurting her. The testimony of Gertrude is substantially the same, except that she said appellee was pushed into a sofa, and the witness into a chair. She testified that appellant accused them of listening in and pushed appellee down in her chest. Appellant denied the assault or any argument at the time and testified he introduced them to March and that they talked awhile. March was not called as a witness.

A third assault is charged on April 7, 1936, the date of the separation. The testimony of appellee and Gertrude is that appellant refused to eat with them, and accused them of trying to poison him; that he came up from the basement and when told that an article about which he inquired was a case for the drum of appellee's grandson, he told appellee she would be dead before the night was over; that a fight ensued between appellant and Gertrude; that appellee interceded, telling appellant to remember what he was doing and he swung back and "cracked her one" on the chest. Gertrude testified that he shoved appellee and she fell back against the stove. Appellee was in delicate health, recovering from pneumonia. She had left her bed only a few weeks previously. She told appellant she could not stand it and was going to faint. He told her to go ahead and faint, and that he did not care, and opened the doors. He ordered her to leave. She left that night. Appellee's daughter and her husband arrived shortly after the assault. They testified appellee was crying and gasping for breath; that when appellant was asked why he started the trouble and was reminded of appellee's physical condition, he said he thought he had waited long enough and could start anything he wanted to with her now; that he refused to consider reconciliation or to buy any coal although they had none and the temperature inside the house was 55 degrees. Alice's husband testified he heard appellant order appellee to get out of the house. Appellant admitted an altercation and fight with Gertrude, but denied striking his wife or ordering her to leave.

The testimony of appellee's witnesses shows she was a kind and dutiful wife. She treated him with generosity, paying practically all the household bills to the amount of over $19,000, for which she makes no claim. She advanced over $7700 to appellant for his personal use, which the testimony shows he repaid except about $350. He drank intoxicants freely and made and kept a large supply on hand.

This court has had frequent occasion to consider what acts and conduct constitute extreme and repeated cruelty within the meaning of the statute. In *Teal* v. *Teal,* 324 Ill. 207, we said the statute means acts of physical violence producing bodily harm,—such acts as put the person against whom they are exercised in personal danger and endanger life and limb. Cruelty constituting ground for divorce under the statute means physical acts of violence, bodily harm or suffering, or such acts as endanger life or limb or such as raise a reasonable apprehension of great bodily harm. (*Moore* v. *Moore,* 362 Ill. 177.) In *Lipe* v. *Lipe,* 327 Ill. 39, we said: "The same act is not the same thing under all circumstances and to all persons. Any willful misconduct of the husband which exposes the wife to bodily hazard and intolerable hardship and renders cohabitation unsafe is extreme cruelty. 'Whenever force and violence, preceded by deliberate insult and abuse, have been once wantonly and without provocation used, the wife can hardly be considered safe.' " Under these principles, the testimony is sufficient to warrant the finding of extreme cruelty on the first and third occasions charged. The chancellor did not err in awarding appellee a decree on the ground of extreme and repeated cruelty. It is therefore unnecessary to consider the finding on the ground of desertion or the cross-error assigned as to habitual drunkenness.

Although denied by appellant, the weight of the testimony shows that he represented he could make more money for appellee in the stock market than her present income amounted to. Her mortgages to about $30,000 were converted into cash and the proceeds turned over to him for investment. He opened an account in her name at each of two brokerage houses, and had two accounts in his own name at each of them. Appellee had nothing to do with the accounts standing in her name, but the transactions were all conducted by appellant. His dealings on the market were voluminous. In 1927 they amounted to over

$1,000,000, and at one time his trades amounted to more than $2,000,000 in less than a year. There were transfers from his account to hers and from her account to his, with purchases, sales and reinvestments. Over $19,600 of appellee's checks to the First Trust and Savings Bank and the two brokerage houses were introduced in evidence. Appellant denied receiving any of them or any money from appellee. Gertrude Ashpach, who was in his employ, testified that she deposited most of the checks to his account in the First National Bank and delivered the others to him. Some of them were partly in his handwriting and some of them bore his endorsement which he admitted. He testified that about a year and a half before the separation he destroyed all records of his stock transactions and had nothing left but a little black book. He did not produce the book or his account in the First National Bank. The evidence shows he received the proceeds of the checks.

One of the transactions shows that Pan American Western stock, with an approximate market value of $8000, was transferred from appellee's account to appellant's by crediting her account with $5487.54, and debiting his account with the same amount. Another transaction shows the transfer of 100 shares of Life Savers stock, which cost $2100, from her account to his, for which no accounting is shown.

One of appellee's checks for $1613.13 dated August 1, 1924, was used to purchase 25 shares of stock which were sold thirteen days afterward for $1610.88. The proceeds were deposited in appellee's checking account. Another check for $3515 was used to purchase 100 shares of other stock which were later sold for $3399.60. The check for this sale bears her endorsement.

At the time of the trial appellee had 75 shares of American Telegraph and Telephone Company stock, and 56 shares of Anaconda Copper stock. Appellant claims he should be credited with the value of this stock and the proceeds of the two sales above mentioned. His brokerage account

shows he transferred 30 shares of the first mentioned company to appellee's account in small amounts from 1926 to 1928, and 12 shares of Anaconda Copper in 1929, at a total valuation of $5625 for all the stocks transferred. Appellee testified she bought all the stocks she held at the time of the trial with her own money, but there is no evidence that tends to show the stocks so transferred to her were ever redelivered to appellant. These instances are the only ones where the record indicates the finality of a specific transaction. Crediting appellant with the proceeds of the two stock sales, and the value of the stock transferred to appellee, or $10,635 in all, and deducting that amount from the aggregate sum of the $30,000 mortgages, the value of the Life Savers stock and the difference in the value of the Pan American Western stock taken over by appellant, amounting in all to $34,642, leaves about $24,000 unaccounted for. This sum approximately conforms to the value of the property decreed to be turned over to appellee.

The parties stood in a relation of trust and confidence, which imposed upon appellant the burden of showing the justness and fairness of his dealings. (12 R. C. L. "Fraud and Deceit" 427.) His fiduciary relation requires an accounting for the funds of appellee, which he has not rendered to the extent of about $24,000, and for which the chancellor correctly held him liable. Appellee urges the award to her should have been larger. The testimony as to financial transactions between the parties is voluminous and involved, with the details and results of many of them not shown. The chancellor arrived at his conclusion after hearing the testimony and due deliberation. From our examination of the record we are unable to say he did not correctly fix the terms of the settlement.

The record shows appellee's counsel appeared in court on numerous occasions concerning preliminary motions. The trial occupied about two weeks. He was necessarily engaged in a considerable amount of office work preparing

the case. In view of the work entailed, the services rendered and the amount involved, the fee of $1500 for his services is not unreasonable.

While the auditor's work involved checks for family expenses, the accounting embraced a search into all the transactions between the parties which were intricate and voluminous. There was no error in assessing his fees against appellant.

The chancellor who heard the cause was from another jurisdiction, and was no longer sitting in the superior court when the motion to vacate the judgment and for a new trial came on for hearing. The chancellor to whom the motion was assigned indicated he thought he had no jurisdiction to hear the motion and denied it. Without regard to the correctness of the chancellor's legal conclusion, the record would not justify vacating the decree. In such a case we will not reverse the order with directions to hear the motion and deny it on the merits.

The decree of the superior court is affirmed.

*Decree affirmed.*