## Laetitia K. Coolidge, Appellee, v. Winthrop K. Coolidge, Appellant.

### Gen. Nos. 46,324, 46,366.

First District, First Division.
January 31, 1955.
Released for publication February 23, 1955.

William C. Wines, of Chicago, for appellant.

Kirkland, Fleming, Green, Martin & Ellis, and Francis J. Benda, all of Chicago, for appellee; Francis J. Benda, and Joseph H. Pleck, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

On March 11, 1952 the plaintiff, Laetitia K. Coolidge, filed her complaint against the defendant, Winthrop K. Coolidge, for separate maintenance, alleging generally that defendant, disregarding his duties to plaintiff and without just provocation, endangered her health and rendered her life miserable and unendurable, and that she therefore left the matrimonial home on March 11, 1952, and has since lived separate and apart, wholly without fault on her part; that at the time of her marriage she received gifts of money and property from her father which she turned over to defendant to manage; that defendant insisted that it was his right to manage and control her property; that he refused to consult with her concerning the investment of the funds and to account for them, and stated that he was going

to change them into his name; that arguments and controversies followed; that as a result of her father's death in 1943 she received a substantial inheritance from his estate, which defendant urged her to permit him to manage and control; that his importunities in this respect continued until prior to the birth of their fifth child in 1944; that following the child's birth plaintiff suffered from a thyroid condition which necessitated surgery; that during her hospitalization defendant continued his demands and importunities, and when she refused to accede to them he cut off her credit in various stores and treated her in such a manner as to cause her great mental anguish; that when she left the hospital she visited her sister in Baltimore for the purpose of convalescing, where defendant followed her and renewed his demands and importunities; that in order to end the quarreling and arguments she finally deposited all her money and property in an agency account in a bank in Baltimore; that defendant bitterly resented her action, shook his fist at her and stated that her conduct had ended their marriage; that he continuously argued and quarreled with her over her property; that he hated her; that he said he was going to fight for the money; and that he subsequently threatened to commit suicide. She further alleged that in the presence of others and of their children he treated her courteously, but when they were alone he sneered at her, refused to answer her, and for the most part ignored her; that following their altercations in 1944 he transferred his belongings from the family bedroom to a back bedroom where he spent most of his time while at home, and talked to plaintiff only when there was some particular urgency for doing so; and that by reason of the "unbearable and unendurable treatment" of plaintiff, she consulted an attorney in May 1951 who sought, without avail, to effect a reconciliation. As a result of these circumstances she quitted the family home on March 11, 1952, and instituted these proceedings.

Defendant answered, denying these charges. A year later plaintiff filed her amended and supplemental complaint for divorce, charging physical cruelty and constructive desertion. These charges were likewise denied by defendant. The chancellor, after hearing the evidence without a jury, on June 25, 1953 entered a decree finding the defendant guilty of cruelty and of constructive desertion, and granting the plaintiff a divorce. The decree reserved for further adjudication "the matter of awarding the permanent custody of the five minor children of said parties, the question of child support, alimony, attorney's fees and costs to be paid plaintiff by defendant, and the matter of determining what, if any, articles of household use, furniture, furnishings, books, silverware and other items of personal use, clothing, wearing apparel and the like belong to plaintiff and should be surrendered to her by defendant and all other matters undisposed of."

Within ninety days after the decree was entered, defendant filed his notice of appeal therefrom. Thereafter supplemental proceedings were had before the chancellor upon the matters reserved in the decree, evidence was adduced in open court, and a supplemental decree was entered on January 21, 1954 finding "that both plaintiff and defendant are capable, fit and proper persons to have the care, custody and control of any one or all of the five minor children of said parties," awarding permanent custody of the older daughters, Laetitia, then fifteen, and Deborah Jean, fourteen, to the defendant, permitting the only son, Dexter, ten, to remain with defendant until "the close of the current school term of the Chicago Latin School in June, 1954," after which permanent custody of the boy was to be awarded to plaintiff, and awarding permanent custody of the two younger daughters, Olga, eleven, and Carol, nine, to plaintiff. The supplemental decree, after making extensive findings as to the relative means and earning powers of the parties, required defendant to

pay plaintiff $150 a month, or $1,800 a year, for the support of Olga and Carol, $150 a month, or $1,800 a year, permanent alimony, and $8,000 in ten annual installments of $800 each, with interest at five per cent, an average for the ten-year period of $1,000 a year. In addition, defendant was required to pay for the expenses of all five children while on vacation with their mother, no amount being specified, and all extraordinary medical and dental expenses for Mrs. Coolidge and the children living with her. The supplemental decree awarded to defendant objects d'art and personal effects in his household, and awarded plaintiff her personal wardrobe and other effects. There were also provisions for the division of wedding presents and periods of visitation as to which no questions are raised.

Plaintiff filed notice of appeal from the supplemental decree, and defendant took a cross-appeal therefrom. His appeal from the decree of divorce and plaintiff's appeal, together with defendant's cross-appeal, from the supplemental decree, were here consolidated upon the joint motion and stipulation of the parties; accordingly, the case comes before us upon (1) the defendant's appeal from the decree of divorce, (2) the plaintiff's appeal from the supplemental decree, and (3) the defendant's cross-appeal from the supplemental decree.

A record of more than 2,500 pages embraces the exhibits and evidence adduced upon the hearing. From it appear the following salient facts: The parties were married on July 20, 1935, and of that marriage five children were born. Defendant is a graduate engineer of Massachusetts Institute of Technology and is president of Chicago Copper and Chemical Company, the stock of which is held in the Coolidge family. Mrs. Coolidge was educated in a New York finishing school, attended Bryn Mawr College of Pennsylvania, and thereafter studied art in New York, Baltimore and England.

It is conceded that the parties, with their five children, lived together happily until 1944. Thereafter differences arose which will be discussed at greater length hereinafter, leading to separation on March 11, 1952, when plaintiff quitted the family home. They had occupied a seven-room apartment at 219 Lake Shore Drive, in Chicago. The girls attended the Girls Latin School at 59 East Scott street, and the boy was a student at the Boys Latin School on North Dearborn street, both locations being in the near north side area. Defendant's place of business was in Blue Island, Illinois, southwest of Chicago. The family had a membership in the Saddle and Cycle Club, and plaintiff was at one time a member of the Junior League. During their early married life they were members of the Fourth Presbyterian Church. Sometime prior to their separation plaintiff joined the Moody Memorial Church. At her request defendant accompanied her to some of its services, but declined to become a member. Subsequently differences arose as to where the children should receive their religious training. At the time the parties were married, plaintiff had received from her father about $50,000, from which she had a monthly income. Defendant's salary was then about $4,000 a year, and he owned a small amount of securities. The subject of finances was first broached by defendant about the time of the marriage, when he commented on the inadequacy of his income; plaintiff thereupon suggested that her income be used to help cover the expenses, and she agreed that defendant could take charge of her securities. She said that she wanted to use her money for the good of the family, and would eventually place it in an agency or trust fund, but meanwhile she would permit defendant to handle it, with the understanding that they discuss its handling together, and that no investment be made without her consent. At the conclusion of the hearing the chancellor remarked that the financial details were significant only insofar as they may

210

form or give the basis for a motive for everything which occurred subsequently, and said that "if no money had ever come into this house except the ordinary amount to keep it going, it would probably be a happy family." As the years passed, defendant's earnings, derived principally from his salary, approximated $20,000 annually. Upon the death of plaintiff's father in 1943, she inherited $100,000. The parties are in agreement that at the time of the hearing and of the supplemental decree, plaintiff's estate amounted to about $168,000. Until approximately 1944, the parties had a joint checking account at the Continental Illinois National Bank and Trust Company, and kept all their securities and valuable personal belongings in a joint safe-deposit box in the bank vault. They both contributed their income to the family expenses which were substantial. They had a joint account which represented deposits of both parties' separate incomes, but defendant had no authority to sell any of plaintiff's securities without her consent and endorsement. Defendant testified that he "never at any time made any investments for her or any material changes in her capital account without either consulting her beforehand or advising her immediately afterwards." He kept detailed bookkeeping accounts which the chancellor used as the basis for his awards in the supplemental decree. Family financial records were accessible to plaintiff at all times, being kept in an unlocked drawer. Plaintiff's contributions to the family expenses represented approximately twenty per cent of the total family income; his, eighty per cent.

In 1944 plaintiff underwent surgery for a thyroid condition. This followed her inheritance of $100,000 from her father's estate. Defendant contends that her attitude toward him underwent marked changes thereafter; that she made charges pertaining to his handling of her estate which she does not now make; that she accused him of falsifying her accounts but declined to

211

examine them. It was about this time that plaintiff withdrew from him the management of her securities that he had always had. We find no evidence to suggest any improper handling or accounting of her estate by him, or any evidence to indicate an investment of plaintiff's capital in his business without her consent.

The decree found in substance that defendant adopted and pursued a course of cruel and inhuman conduct toward plaintiff which was designed to render her life unbearable and compelled her to leave him; that she gave him no cause or provocation for his treatment of her, and "by reason of the foregoing, defendant has wilfully absented himself from plaintiff without any reasonable cause . . ."; the decree also found that defendant has been guilty of extreme and repeated cruelty toward plaintiff on the following dates: in the month of February 1948; on March 30, 1952; and on October 30, 1952, as alleged in the first amended and supplemental complaint; and thereupon dissolved and voided the bonds of matrimony.

With respect, first, to the charges and findings in the decree concerning the three separate acts of cruelty, it will be noted that the first is alleged to have occurred four years prior to the separation, the other two after plaintiff had quitted the family home. The original complaint made no mention whatever of any act of physical cruelty. As to the first act of cruelty, the amended and supplemental complaint alleged that "in February, 1948, because plaintiff refused to give defendant the money which he demanded for the payment of the prior year's tax, defendant became enraged and grabbed plaintiff by the arm and twisted the same, causing her pain and suffering; . . ." On direct examination plaintiff gave testimony to this effect. Defendant denied any argument with his wife with reference to any financial demand, denied that he twisted her arm or struck her on that or on any other date, and offered the following testimony which is

212

uncontradicted. "In 1948 Mrs. Coolidge and I did not file a joint income tax return for the year 1947. At that time, as far as I know, Mrs. Coolidge's income tax return was prepared by the Trust Department of the Baltimore National Bank. I had nothing whatsoever to do with the preparation of that return or the payment of whatever was due under the return. Mrs. Coolidge always wrote the checks. At that time I did not ask Mrs. Coolidge for $500 for the payment of income tax, or any other sum." On cross-examination plaintiff corroborated defendant's testimony. She stated that "the bank made out my income tax return [referring to the return filed in 1948 for the year 1947]. Any money owing on income tax at that time should be paid on the return filed by the bank." The record supports defendant's testimony; an income tax return was prepared, not by defendant but by a bank in Baltimore, and the tax was paid from funds of plaintiff handled by the bank. Defendant had nothing to do with the payment of the tax in that year.

The second act of cruelty is alleged to have occurred on March 30, 1952, some twenty days after plaintiff had quitted the family home. She testified that she returned to the apartment to call for the two younger daughters; that they needed some of their clothing to take with them; that she proceeded to the nursery to pack some of their clothes, whereupon defendant came in and said that he did not want her to take any of it away, and refused to allow her to do so. While she was in the nursery, plaintiff continued, she overheard defendant's mother talking in the dining room and said she wanted to see her; defendant, however, "stood in front of the door, and I took hold of the knob and tried to open the door and he took me and threw me against the wall and I said I had to go, I couldn't stay, please let me out, and I took hold of the knob again and he took me again and threw me against the wall and I said 'Please let me go' and he finally let me go. My arm and shoulder

213

came in contact with the wall and I felt pain." Defendant recalled the incident when plaintiff returned to the apartment to get clothing for the two younger daughters. He testified: "I said, 'I have no objection to your taking clothing for Olga and Carol, but will you please leave the suit cases? You have most of the family suit cases in Winnetka now. . . . They [the children living with him] may need them and I think you can just as well take these clothes in some other package. She said, 'No, I am going to take the suit cases.' We had some further discussion. She became extremely excited and said she was going out to the dining room to speak to my mother and father who were seated there having supper. This was on the Sunday evening. My parents were each seventy-nine years old and I said, 'I don't want you to go into the dining room. I don't want you to disturb mother and father. They will be very much upset. You are in a very excited condition. Please stay here in the nursery.' I stood in front of the door and as I stood there she came toward the door and tried to push me aside. Whether I raised my hands and pushed her back or whether I simply stood in front of the door and resisted her pushing me aside, I can't tell you, but I did not push her or twist her arm or commit any other act which could possibly be construed as cruelty. I did not knock her to the floor at that time nor did I strike her."

The third act of cruelty is alleged to have occurred on October 30, 1952, when plaintiff returned to defendant's apartment to get some personal belongings, accompanied by a Miss Beddingfield, who helped her with the packing. Plaintiff said that she had a trunk brought up from the storeroom in which she packed her lingerie and dresses, as well as clothes belonging to the children, also some towels, sheets and pillow cases; that defendant was there while she packed the trunk; that she had gone to take a box of silver in the dining room when defendant "raced up . . . and said, 'Don't take

214

that' and I said, I am just taking the silver that belongs to me, that was given to me by my family for a wedding present, and he said 'You have no right to have it, absolutely no. You can not take it.' And he grabbed hold of the box and he was arguing, talking very loud, very red in the face, shrieking about the silver that he wanted it left there, and he backed me up into the trunk in the hall and he was holding tight onto the box and I was trying to hold onto the box and he was going into the dining room with the box and I was holding onto the box and in the tussle over the box I was knocked on the floor and he took the box and put it on the table and I took the box again, and he started again going with the silver box. We were all the time talking in loud voices, he was saying I could not take the silver and he was pulling on it and again in the tussle I was knocked down on the floor and finally I said, 'I will have to go now' . . . At the time I came in contact with the floor I felt pain and I saw marks or bruises, two here on my right leg and one on my left leg." Defendant, recalling the incident of October 30, 1952, testified that an arrangement had been made between the respective counsel by which plaintiff was to come to his apartment to pick up certain personal effects, but that no controversial items were to be removed; that he sat in the living room while plaintiff packed the trunk; that his son "Dexter came in and said, 'Father, mother is taking the silver.' I got up and went to the dining room and saw that Mrs. Coolidge had the box apparently containing all of the flat silver. I said, 'Please don't take the silver.' She paid no attention to me and went toward the front door. I said again, 'Please don't take the silver. The understanding that we had was that nothing controversial was to be removed.' She still paid no attention to me. I then took hold of the end of the box of silver farthest from her and held onto it. She pulled on the box and I continued to hold onto it. In the course of the pulling

215

we moved around the dining room somewhat. I said, 'If this slips out of your hands and you lose your balance and fall, don't blame me.' She screamed, 'I will blame you.' A few moments after that the box slipped out of her hands and she sank to the floor. She had a fur coat on. I said, 'Do you want me to help you up?' She made no answer but got up by herself. She did not fall again. There was only one time that she fell to the floor. It did not happen twice. At that time I did not strike her or push her or shove her in any manner."

These three acts of cruelty, as charged in the amended and supplemental complaint and as testified to by plaintiff, are wholly uncorroborated. Although Miss Beddingfield was admittedly present during the occurrence on October 30, 1952, she was not offered as a witness by plaintiff, nor was her absence accounted for. Defendant had never seen her before, nor has he seen her since.

After a careful examination of the record, we are convinced that the finding of cruelty is not supported by the evidence; the alleged occurrence in 1948 is inherently improbable for the reasons heretofore indicated; moreover, if it occurred, it was condoned by the admitted subsequent cohabitation of the parties. The other two alleged acts were in essence nothing more than incidents resulting from tussles growing out of disputes as to the carrying away of controversial effects.

It has been held in Illinois that divorce will not be granted upon uncorroborated testimony as to alleged acts of physical cruelty. In Whitlock v. Whitlock, 268 Ill. 218, the husband filed a bill for divorce charging adultery. The wife, having denied the charge by answer, filed a cross-bill charging extreme and repeated cruelty. The cause was heard by the court without a jury, resulting in a finding for the husband. The Supreme Court, notwithstanding the chancellor's find-

ing, found the husband's charge of adultery unproved; it likewise found the wife's charge of cruelty unproved, and with respect to the latter said: ". . . the defendant testified to two acts of cruelty and physical violence by the complainant [the husband]. To justify a divorce on the ground of extreme and repeated cruelty the cruel treatment proved must be actual violence and it must be repeated. . . . (Ward v. Ward, 103 Ill. 477.) There is some corroboration as to one of the alleged acts, but the evidence, for the most part, is entirely that of the defendant, and the complainant denied her charges. There should be evidence of such acts as would constitute sufficient cause for divorce under the circumstances besides the evidence of the party to the suit who makes such charges, where such acts are denied."

In Jackson v. Jackson, 294 Ill. App. 552, the chancellor's finding that the husband was guilty of cruelty was reversed because there was corroboration as to only one of the charges.

██ ██ Moreover, the rule is well established in Illinois that the "extreme and repeated cruelty" that is cause for divorce must be grave and endanger life or limb, or at least subject the person to danger of great bodily harm. Slight acts of violence by either spouse are not extreme cruelty within the statute authorizing divorce on such grounds. Amberson v. Amberson, 349 Ill. 249; Aurand v. Aurand, 157 Ill. 321. There are cases holding that the cruelty must be such as to render continuous cohabitation dangerous. Wesselhoeft v. Wesselhoeft, 369 Ill. 419; Trenchard v. Trenchard, 245 Ill. 313; Aurand v. Aurand, 157 Ill. 321; Ward v. Ward, 103 Ill. 477; Mason v. Mason, 342 Ill. App. 140. It was not the intent of the legislature, nor is it the sense of the opinions of the review courts of this state, of which there are many, that a spouse should be able to sever the marriage relation by such slight acts as were here

adduced in evidence; the charge of cruelty is a serious one which must be clearly proved.

■■ This leads to a consideration of the finding in the decree of constructive desertion. It is conceded that plaintiff quitted the family home and moved to Winnetka with the two younger daughters, far removed from the family home where the three other children remained and attended school. Of course the issue of desertion cannot be resolved by a technical criterion. The spouse remaining in the home, if he or she has driven the other spouse therefrom, is the one guilty of desertion; and certainly if a husband drives his wife out of their home, it is the husband, rather than the wife, who is the deserter, even though he continues his residence in the same quarters. However, the rule is clear in Illinois that in order to support the charge of desertion by the spouse who physically leaves the home, the "reasonable cause" that justifies the departing spouse in leaving must be such that it would of itself entitle the party abandoning the home to a divorce. (Fritz v. Fritz, 138 Ill. 436; Holmstedt v. Holmstedt, 383 Ill. 290; Swan v. Swan, 331 Ill. App. 295; Frank v. Frank, 178 Ill. App. 557.)

Plaintiff argues that recent cases have departed from the rule enunciated in these opinions, and cites Abraham v. Abraham, 403 Ill. 312; Holmstedt v. Holmstedt, 383 Ill. 290; Van Dolman v. Van Dolman, 378 Ill. 98; French v. French, 302 Ill. 152; and Sewell v. Sewell, 297 Ill. App. 283. In the Abraham decision plaintiff sued for separate maintenance on the general ground that her husband had made her life miserable by his association with lewd women, treating plaintiff with contempt and in a degrading manner, and that he was also addicted to certain habits disclosed by the evidence which, as the court said, "because of their vulgarity, are not necessary to be inserted in this opinion." In the Holmstedt case, also cited and relied upon by defendant, the court said it was clear that "appellee [the hus-

218

band] suffered from an irresistible habit of getting drunk, bringing himself within the definition of 'habitual drunkenness,' . . . and also was guilty of extreme and repeated cruelty." In the Van Dolman case, although the court observed that a wife may lawfully leave her husband, even though she has no ground for divorce, and that the separation, if persisted in for the statutory period without change of status, may be sufficient to entitle her to a divorce on ground of desertion, the record did not show when the actual separation occurred, and the time of absence from the home therefore could not be computed. In French v. French, a proceeding for separate maintenance, plaintiff charged, and the evidence disclosed, that her husband had lost his affection for her and "was deeply in love with a certain other married woman, and naming her," and that "while living with her he violated his marriage duties and obligations in the grossest and most flagrant manner by associating on terms of intimacy and frequently visiting the said married woman at her apartment. Such visits were of almost daily and nightly occurrence while he was living with complainant as her husband and were equally frequent after their separation, so as to attract not only the attention of complainant but the attention of her various friends and acquaintances." And in Sewell v. Sewell, 297 Ill. App. 283, the wife was driven out of the family home, and even though specific acts of cruelty testified to by her were not directly corroborated, the court observed that her husband's treatment of her "over a period of years was harsh, cruel, insulting and abusive." Tested by these decisions, the charge of constructive desertion cannot stand. The utmost that this record shows, taken in its aspect most favorable to plaintiff, is that the parties quarreled over money, over religion and over sundry other matters. After plaintiff changed her church affiliation, she looked with disdain upon card playing; she objected to the older daughters dancing with boys;

prohibited their attendance at commercial movies for the reason, as she put it, that motion picture actors were, as a class, immoral.

Charges that defendant failed to account for his handling of her estate are not substantiated by the record. Plaintiff does not contend that there were any irregularities in his handling of her estate but, rather, that his accounts were unintelligible, and that he refused to explain them. As a matter of fact, the parties for many of the years in question filed separate income tax reports prepared by defendant. In these reports he necessarily had to account for plaintiff's securities; the reports were examined and signed by her, and this, it seems to us, was in itself an accounting of which she indicated her approval. When plaintiff withdrew from defendant the handling of her estate and placed her securities with a Baltimore bank—as she had a legal right to do—defendant considered it an affront upon his integrity, especially in view of the fact that he had handled her estate for ten years without complaint on her part. The arguments, bickering and controversies testified to at great length, pro and con, centered, for the most part, around money. Plaintiff testified that their married life had been happy up to 1944. The record discloses that she had gained complete control over her securities in 1942, indicating that the unhappy rift between the parties did not have its inception in her accession to complete control over her securities, but began some two years later, and had its genesis in accusations which the evidence shows to have been groundless.

It is conceded that in the course of the altercations over these various matters the parties ceased to live together, except on occasion, as husband and wife. Plaintiff stated that when their youngest child was some six or seven months old, as an accommodation to the nurse, she let her bring the child into the bedroom occupied by plaintiff and defendant, and that the infant

220

was occupying defendant's bed only until a crib could be set up in their room; and she added that following this change, defendant moved his clothes into the back bedroom. Defendant, on the other hand, testified that his clothes had been removed to the back bedroom, and he explained that he saw no reason why their infant daughter, having been in the nursery for the first six or seven months of her life, had to be moved to their bedroom. When he found his clothes moved to another room and his bed in use, he concluded that he "had been put out."

■ Prior to the rendition of the original decree for divorce, the chancellor delivered an oral opinion, the tenor of which was to declare plaintiff "covetous to a degree," and to characterize defendant as penurious and penny-pinching with both his own and his wife's money. It contains no discussion of the evidence with respect to plaintiff's charges of physical cruelty or constructive desertion, and concludes with the observation that "this court, from what it has seen and heard, believes that these parties can never honestly live together again, honestly and properly. Whether they like it or not, the court feels there should be a divorce. Divorce will be granted to the woman." It may well be that the parties will never live together again, but we are satisfied from a careful examination of the evidence, that both contributed to the discord which resulted in the separation. Under the facts and the clear weight of authority, the decree granting divorce on the ground of constructive desertion was erroneous.

■ The parties raise the question as to whether the supplemental proceedings, subsequent to the filing of defendant's notice of appeal, were coram non judice and therefore void. In view of our conclusion that the decree for divorce was erroneously entered, questions of child custody, child support, alimony, property division and attorney's fees need not be decided. For the reasons indicated, the decree of the circuit court is re-

versed at plaintiff's costs. Plaintiff's appeal from the supplemental decree and defendant's cross-appeal from the supplemental decree are dismissed.

Decree reversed at plaintiff's costs; appeal and cross-appeal from supplemental decree dismissed.

BURKE, P. J. and NIEMEYER, J., concur.