Ruth Walker Sewell, Appellee, v. Arthur Sewell, Appellant.

Gen. No. 40,013.

284

Heard in the second division of this court for the first district at the April term, 1938. ■■■■■■■■ Opinion filed November 17, 1938.

TEED, KAMMERMANN & JOHNSON, of Chicago, for appellant; HUGH E. JOHNSON, of counsel.

ALVA L. BATES, of Chicago, for appellee.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

A decree was entered September 30, 1937, which granted separate maintenance to plaintiff, Ruth Walker Sewell, from her husband, Arthur Sewell, defendant. Said decree ordered defendant to pay plaintiff $900 a year for her support in instalments of $75 a month, commencing October 1, 1937, and $600 for her solicitor's fees in instalments of $50 a month, commencing on the same date. Pursuant to a petition filed by plaintiff, a rule to show cause was entered against defendant for his failure to pay the instalments for

maintenance and solicitor's fees due October 1, 1937. This rule was discharged on November 8, 1937, by the payment by defendant of $125. Having failed to pay the instalments for maintenance and solicitor's fees due November 1, 1937, and December 1, 1937, another rule to show cause was ordered to issue against Sewell pursuant to plaintiff's petition of December 9, 1937. Defendant filed an answer to said petition and rule asserting substantially that he had not made the payments ordered because of his inability to do so. December 20, 1937, an order was entered finding defendant guilty of contempt for his failure to make the payments aggregating $250 for maintenance and solicitor's fees due up to and including December 1, 1937, and committing him to the county jail for such contempt. This appeal is prosecuted to review this order of commitment, as well as the decree for separate maintenance.

Following are the material allegations of plaintiff's complaint bearing on her right to an award of separate maintenance:

"That plaintiff was lawfully married to the defendant on the 19th day of October, 1926, at Detroit, in the State of Michigan, and from time to time until on or about the 18th day of April, 1937, they lived together as man and wife.

"That during the entire period from the date of said marriage to the present time, the plaintiff has faithfully performed all her duties and obligations as a wife, always conducting herself towards the said defendant with kindness, love and affection.

"That there were no children born to or adopted by the parties to the said marriage.

"That the said Arthur Sewell, not regarding his marriage vows and obligations, has since his marriage to plaintiff been guilty of extreme and repeated cruelty towards plaintiff in this, that he has used toward

plaintiff on many occasions obscene and abusive language, and on numerous occasions has used personal violence towards her; that particularly on the 24th day of December, 1935, the said Arthur Sewell struck plaintiff severely and chased her with a gun; that again on the 6th day of January, 1936, the defendant struck the plaintiff in her face with his hand, severely and seriously injuring her, using toward her, at the same time, vile and opprobrious epithets; that on numerous other occasions Arthur Sewell struck, beat, bruised and scratched plaintiff, and that at all of said times hereinbefore mentioned, his conduct was without reason or provocation.

"That the conduct of the defendant towards the plaintiff, as hereinabove mentioned, resulted in a separation of the plaintiff and the defendant. That on March 26, 1937, the plaintiff returned to the home of the defendant at 4911 Vincennes Avenue, Chicago, and sought a reconciliation of their differences, but that the said defendant used vile and abusive language toward the plaintiff, told her to get out of his home, changed the locks on the doors of said home so that if she ever found it necessary to go out of the home she could not reenter; that the said defendant locked the door of the kitchen so that she could not prepare food, locked the linen in his bedroom, disconnected the telephone so that she could not order food, and humiliated and embarrassed her by telling her friends not to come to the home.

"That the defendant lives at 4911 Vincennes Avenue, Chicago, that said premises are owned by the two minor sons of the defendant by a prior marriage, and that the Probate Court of Cook County, Illinois, has jurisdiction of said minors' estate; that the defendant, Arthur Sewell, plotting and conspiring to compel the plaintiff to live separate and apart from him, caused Arthur W. Sewell, one of his minor sons, to file a peti-

tion in the Probate Court of Cook County requesting that the plaintiff be evicted from said premises; that an order was entered in said Probate Court directing the plaintiff to vacate said premises and that pursuant to said order, and against her will, the plaintiff was compelled to and did leave the home of the defendant, April 18, 1937, and plaintiff without any fault on her part is now living separate and apart from the defendant. That during the period from March 26, 1937, to the present time, the defendant has contributed the sum of $5.00 towards the support of the plaintiff.''

Defendant's answer denied plaintiff's charges as set forth in her complaint and asserted that ''the parties were living separate and apart by reason of the fault of plaintiff and not the fault of defendant.''

For a clearer understanding it is necessary that the evidence be set forth somewhat fully. Plaintiff testified that she and defendant were married October 19, 1926, at Detroit, Michigan; that they have been residents of Chicago for more than 10 years; that no children were born of the marriage; that her husband had two children born of a previous marriage, who lived in the home with her and her husband; that she last separated from her husband on April 18, 1937; that, while they lived together as husband and wife, ''I did those things that were necessary for his comfort and happiness . . . took care of the children, cooked, and housekept, and things of that nature, entertained friends''; that ''in September, 1930, we were on the front porch of our home, and my husband told me that he had been downtown in the afternoon to consult a specialist . . . he had been having a physical disability for some time . . . he said that after he made a diagnosis he suggested that we occupy separate rooms for an indefinite period . . . he asked me if I would agree that we should occupy separate rooms for the time being, he couldn't say how long, and I told

him that if it would benefit his health, as he thought it would, I would be glad to do so''; that they continued to occupy separate rooms from September, 1930, until about May, 1932; that her husband furnished the money for her to take a trip to California in 1932; that when she returned from California in August of that year ''he told me that he would remain separated in the home permanently, that we should occupy separate rooms continuously, and that he didn't want me to enter his bedroom without his permission at any time, that he was through with me, and he pointed to the door and he said 'I have no more feeling for you than I have for that door,' . . . he said, 'get yourself another man, and you can remain in this house so long as you conduct yourself all right, you can do all you want on the out side,' and of course I argued with him a few minutes about it, and I asked him if he were physically well again and he said yes, he was, but he didn't care to argue the point, to do as he said''; that ''on January 5, 1935, about midnight, my husband knocked on the door and entered . . . my bedroom door, and asked me to come back to his room . . . he would like to have a conversation with me, and I immediately went in and when I entered he said— asked me if I noticed that he spoke to me on New Year's Day for the first time in a long time, and I told him yes . . . he said some sort of a change had come over him and that he would like to talk the matter over with me, he hadn't had peace for a long time, and with the coming year he would like to experience some measure of peace, and asked me if I would aid in making this peace, bringing this peace, and I was rather overjoyed and I readily agreed to do so''; that the defendant's sons (Arthur Sewell became of age in September, 1937, and John W. Sewell will become of age in November, 1939) left Chicago in September, 1935, and ''went away to school, one to the University of Cali-

fornia and one to Tuskegee"; that "after his sons went away to school defendant said he wouldn't eat there at home . . . he spent very little time at home after they went away"; and that, her husband having failed to furnish her with sufficient money to buy food for herself, she wrote him the following note in October, 1935:

"Each week I have to spend close to $5.00 for food and last week my bill amounted to $4.90. $3.00 was left on the table so toward the end of the week had to charge $1.90 expecting to receive the $2.00. This week the bill amounts to $4.82 making a total of $6.72. I left the $3.00 on the desk Sunday because I cannot feed myself properly on that amount."

Plaintiff also testified that on said note defendant wrote an answer as follows:

"Get your man to help feed you. I am through with you and if you have pride enough to leave you would find out that I would have more respect and consideration for you than I have. I don't want you and I am sure you don't want me. I told you that if I ever got anything I would try to make a settlement with you. If you'll leave I am willing to have my lawyers draw this up. My children don't want you here either and you make yourself lower than a dam dog to stay where you are not wanted and you are not worthy of staying. I can prove that you are having men and have been having them for years. I would have a jip before I would you again, and that is that."

Plaintiff further testified that "on December 24, 1935, my husband left the home in the morning and returned about an hour later and ran in and I was in my room changing my dress and I heard the door slam downstairs and simultaneously I heard him say 'Give me my money, give me my money' and he ran all the way up the stairs yelling 'Give me my money,' and he ran through my bedroom door into the room and I

was changing my dress and he ran up to me, of course my attention had been aroused by the noise and he ran up and said 'Give me my money, I will kill you if you don't give me my money' . . . I said 'What money?' He said 'You took $25.00 out of my pocket in my room' . . . I said 'I can't go in your room how can I take $25.00?' He said 'Give me my money woman I will kill you' and before I could answer he slapped me in the face and slapped it in such manner the blood started falling from my face, and he ran out of the room in the direction of his own room and in a few minutes after that came with the gun yelling he would kill me . . . I ran to the door and locked it, he stood outside trying to make me open the door and I didn't do that . . . later on he found his money and passed by the door and said 'if I hadn't found my money I would kill you' and went out and slammed the door''; that ''on January 6, it was after dinner that he returned home . . . around six-thirty, and two men came in with him . . . I had had my dinner and was upstairs preparing to go out . . . after they had dined he came upstairs and walked down the hall towards his bedroom and he ran into a door that was open, and he immediately yelled out that I had left the door open for him to run into . . . he was swearing, and knowing that these men were guests in the house, I came out of my room door into the hall and tried to quiet him, and as I came out of the door he slapped me in my face, I couldn't see for a moment, the eye was discolored after that, and the housekeeper who had prepared his dinner was coming up the stairway saying 'Mr. Sewell you don't know that Mrs. Sewell left the door open I might have left it open, any one could have left it open, remember you have company' . . . he was standing there, he had just struck me and she was about to go down, and she came upstairs and said 'Any one could have left it open, I

haven't heard Mrs. Sewell in that part of the house all afternoon.' . . . he. went on swearing, saying everything imaginable, calling me names I wouldn't care to repeat . . . he called me whore, bitches, called me a cow . . . and other vile names''; that she left defendant's home in August, 1936, and returned to same March 26, 1937; that after she returned ''he was very abusive, he resented very much when I came home . . . he tried to strike me on several occasions . . . he had a man to make keys to all the doors, he locked me out of the kitchen, I couldn't get meals from one day to the other in many instances . . . the next day after I was there he sent up $5.00 by a man he had hired to lock me out if I went out and to watch me generally . . . he sent this man up on Saturday evening after I had gone back Friday, and he said 'here's $5.00 for you, you are to get your food with.' . . . I thanked him for the $5.00 . . . next morning Sunday I called up for some groceries, and Mr. Sewell heard me . . . he said I shouldn't use that money calling for groceries, 'I want you to go out and get your groceries.' . . . I was locked out from the kitchen for many days, . . . he would tell the maid when I did get in the kitchen . . . 'lock up our food, don't let her have any of our food' . . . he locked the linen up in the linen closet . . . his room door had a Yale lock on it . . . he ordered me up from listening to the radio, he ordered me up to my room . . . he said 'Get upstairs, get in that room' . . . the very next morning after I ordered these groceries the telephone was taken out, was out seven or eight days, just about nine days''; and that her friends were refused permission to enter the home or talk to her on the telephone.

Plaintiff then testified that on March 17, 1936, she filed a complaint for separate maintenance against defendant and that pursuant to a restraining order

entered in that case she vacated the premises in which she had been living with her husband on August 16, 1936; that she was awarded temporary support in that proceeding from July 17, 1936, until it was dismissed by her on October 21, 1936; that on the same date, after her bill for separate maintenance had been dismissed, defendant brought an action for divorce against her in the circuit court and again obtained an order restraining her from entering his home; that defendant's bill for divorce was dismissed on March 25, 1937; that on March 26, 1937, she returned to the home of defendant; that he then told her that he would see his lawyer and have the probate court put her out and that he would not live in the same house with her; that on or about April 7, 1937, she was served with a notice and petition signed by one of defendant's sons to appear in the probate court October 9, 1937, at which time an order would be sought requiring her to vacate the premises; that on April 9, 1937, she was ordered to vacate said premises and forever restrained from entering same; that in compliance with said order she vacated the premises used as a home by defendant and his sons on April 18, 1937, and that this proceeding was instituted May 18, 1937.

Mattie Williams, who worked for defendant as a maid in January, 1936, and from April to August, 1937, testified as to the occurrence related by plaintiff on January 6, 1936, that "he called her cow, bitch, whore and a whole lot of things like that"; that "there were two men there to dinner, they tried to calm him down . . . they said, I wouldn't talk like that"; that during all the time she worked for Sewell "he told me not to put a plate on there for her . . . I used to put a plate on but she never ate there, she eat afterwards, but he told me not to put a plate, not to set the table until he came home"; and that on numerous occasions she gave plaintiff a portion of her own food.

Gertrude Miller testified that she worked as a house-keeper for defendant from January, 1937, to April, 1937, and that plaintiff was in the home for 8 or 10 days while she was there. She corroborated plaintiff's testimony as to the defendant's treatment of her during that period and that she heard the defendant on numerous occasions call plaintiff vile names.

Sara Proffitt testified that on April 9, 1937, she went to the Sewell home and inquired for plaintiff; and that defendant slammed the door in her face and told her to find some other means of talking to Mrs. Sewell.

Ola May Coty testified that ''she was a beautician and that while she was at the Sewell home fixing plaintiff's hair on April 15, 1937, the defendant came in, told her to get out and not bring messages to plaintiff and that he was having the Probate court put the plaintiff out in a day or two.''

Defendant denied that on December 24, 1935, he slapped plaintiff's face, causing blood to flow or that he threatened her with a gun on that occasion. However, he admitted that he accused her at that time of taking his money and that he used bad language to her. He stated that he changed the locks on the doors of his home once or twice to keep her from entering same because she was a nuisance. He denied that he struck plaintiff January 6, 1936, or at any other time. He also denied that he had anything to do with having her removed from their home in April, 1937, when she was ordered out of same by the probate court. He testified that the premises in which they made their home belonged to the Sewell estate, of which his sons were the beneficiaries, and that it was on the petition of his oldest son that her removal was ordered. Although plaintiff lived in the home with defendant and his sons for almost 10 years, there is not a word of credible evidence in the record of any unchaste or other improper conduct on her part. According to the evi-

dence, she treated defendant as a wife should as long as he permitted her to do so and took care of his home and children. Neither of his sons testified and in his testimony, while defendant insinuated and charged generally that plaintiff was a thief and that she was guilty of adultery, he stated no fact or circumstance which tended to prove or from which it could be inferred that she was other than a faithful wife, ready to perform her duties and assume her obligations as such, if she were permitted by him to do so.

It is true that one Hall, a private detective, who had been employed by defendant to investigate or "shadow" plaintiff, testified that he saw her with a man in her home and in an automobile under compromising circumstances, but his testimony is so unworthy of belief, we feel that it should be entirely disregarded.

Sewell claims that the acts of cruelty charged by plaintiff were not proven and more especially that there was no corroboration of her testimony as to same. While there was no direct corroboration of defendant's testimony as to the specific acts of cruelty, it must be held that plaintiff's evidence considered in the light of the reasonable probabilities and in connection with all the other evidence in the case sufficiently proved such acts.

In passing upon a somewhat similar situation in *Harris v. Harris,* 109 Ill. App. 148, the court said at p. 151:

"It is not claimed in argument that if the testimony of the complainant is true it fails to establish a case entitling her to relief under the statute. But it is said that her testimony, so far as it relates to the acts of cruelty complained of, is uncorroborated, and is explicitly denied by the defendant in every detail. Such is the state of record. But that does not call for a reversal of the finding of the chancellor; the rule of

evidence is too well settled to need the citation of authorities, that the preponderance of the evidence does not necessarily depend upon the number of witnesses. Testimony is weighed, not counted. The chancellor saw the witnesses and had superior opportunities for determining their relative credibility. He believed and gave credence to the testimony of the complainant, and from an examination of the entire record we fail to see any reason why he should not have done so. It is insisted that if complainant's testimony is true she could very easily have had corroboratory proof. She was not beaten by her husband upon the public streets. He did not summon the neighbors to witness the acts of brutality testified to by the wife which she says were inflicted when they were alone in the solitude of the home. The fact that she did not exhibit the evidences of his misconduct, but bore her sadness and suffering in silence, does not militate against the truth of her testimony."

Even though the specific acts of cruelty alleged and testified to by plaintiff were entirely eliminated from consideration, the evidence abundantly proves not only that plaintiff is living separate and apart from defendant without fault on her part but that defendant's treatment of her over a period of years was harsh, cruel, insulting and abusive. Plaintiff did not leave defendant's home. She was driven out of same. The right to live apart from one's husband and to be entitled to separate maintenance not only arises when the husband's conduct directly endangers the life, person or health of the wife, but also "where the husband pursues a persistent, unjustifiable and wrongful course of conduct toward her, which will necessarily and inevitably render her life miserable, and living as his wife unendurable." *Johnson v. Johnson*, 125 Ill. 510; *Short v. Short*, 265 Ill. App. 133. We are impelled to

hold that the evidence in this case amply justified the entry of the decree for separate maintenance.

It is urged that the amount allowed in the decree for plaintiff's support is unreasonable and excessive in view of the circumstances of the parties and of defendant's inability to pay same, and that the attorney's fees allowed are likewise unreasonable and excessive.

Defendant is about 62 years old and it may be conceded that he is suffering from serious bodily ailments and has no present earning power. He is, however, not only living in comfort but in comparative luxury with his sons. Plaintiff, although an able-bodied woman, has been unable to find employment and is without means of support.

Plaintiff's complaint alleged and it was not denied that defendant is the owner of an estate by curtesy consummate and is entitled during his natural life, after his two sons by a prior marriage reach their respective majorities, to all the rents, issues and profits arising and accruing from 160 acres of land situated in Ouachita county, Arkansas; that, as heretofore stated, his son, Arthur W. Sewell, became 21 years of age in September, 1937, and his son, John W. Sewell, will become 21 years of age in November, 1939; that defendant and his sons executed a gas and oil lease on said land and for a number of years it has been and is now producing gas and oil; that ''all funds arising from the said oil and gas lease of said 160 acres of land, including the consideration of $65,000 originally paid for the execution of said lease or the properties and securities in which said funds have been invested (but not the income earned on such funds) is a corpus of the estate of the defendant's said minor children; that the present value of the corpus of said estate is $500,000 and is constantly increasing; that the minor sons of defendant under their homestead in said 160 acres of land are entitled to all of the usufruct, rents,

issues and profits arising during their respective minorities from said land and to the earnings upon all the funds which have arisen, or shall arise during their respective minorities from the said oil and gas lease''; and that ''defendant, as the owner of an estate by the curtesy consummate, is entitled during his natural life, in all of the usufruct, rents, issues and profits from and after the majority of said minors . . . thereafter arising from said 160 acres of land, and to the earnings from and after the majority of said minors upon all the funds which have arisen or shall hereafter arise from the said oil and gas lease.''

There was evidence that defendant was the guardian of the estate of his minor sons for a number of years and that several items in his report as such guardian have been objected to by his successor guardian in an attempt to surcharge him with the amount of such items. There is also evidence that defendant had assigned his interest in the Arkansas land as security to the bonding company, which was and is the surety on his bond as guardian.

Since it is admitted that the corpus of the estate from which defendant will receive the entire income, commencing in November, 1939, amounted at the time of the trial to $500,000 and that such corpus is constantly increasing, it is not unreasonable to anticipate that Sewell's income after said time will be approximately 4 per cent of said corpus or $20,000 a year. Does the fact that defendant does not come into the enjoyment of the income from his estate until his youngest son becomes of age in November, 1939, leave him so personally devoid of property as to render the allowance in the decree for support and solicitor's fees improper? This precise question was considered and determined in *Reifschneider v. Reifschneider,* 144 Ill. App. 119 (affirmed 241 Ill. 92) wherein the deceased maternal grandfather of the defendant husband left

property in trust of the value of $150,000. The mother of said defendant was given a life estate in the property and at her death it was to be distributed among the surviving children or their descendants. The defendant husband had no present enjoyment of his interest, he did not know what his interest would be and he would have to survive his mother to get anything from the estate. There the court said at p. 127: "It is evident from the record that appellant, so far, has not developed the capacity to earn much money, his ability in this line extending to not more than $15 a week. He is not possessed of any money. But he has admittedly an interest in property, subject to a life estate in his mother, under the will of Mathew Gottfried, the deceased maternal grandfather of appellant. The estate in the hands of the trustees of the Gottfried estate, in which appellant is the remainder man, exceeds $150,000 in value.

"In view of this prospective inheritance, the allowances made both for support and solicitor's fee and suit money must be regarded as moderate and in every way reasonable, and in accordance with the condition in life of appellant. He has property from which he can realize money, if he chooses, to support his wife. This the law requires him to do."

The customary manner in which to "realize" money on one's interest in property is to sell same in whole or in part or to pledge it as security for a loan. There is no evidence in the record that defendant made any attempt to do either and the vague, indefinite evidence in the record as to a possible surcharge against him on his guardian's report or the possibility that the surety on his bond as guardian of his sons' estate, will take over his interest under his assignment or assignments to it, cannot affect his obligations toward his wife.

In *Johnson v. Johnson,* 36 Ill. App. 152, the court in determining the financial means of a husband for the purpose of fixing the amount of alimony he should be ordered to pay considered his interest in his father's estate, which would come into his possession after his mother's death. In *Parker v. Parker,* 61 Ill. 369, the court said at pp. 371, 372: ''The court only decreed that he should, in discharge of a legal duty, pay a certain sum every three months to defendant in error. It does not order him to labor to earn it. He is left at liberty to raise the means by the sale of his personal property or real estate, or produce it from his regular pursuits, as may suit his inclination or his interest. . . . It can not be that the court would have no power to decree alimony in money, simply because the defendant has no productive property, as seems to be contended by counsel, or even if he was destitute of property.''

In *Muir v. Muir,* 133 Ky. 125, 92 S. W. 314, 4 L. R. A. (N. S.) 909, the court discussing what property of a husband may be considered as a basis for the allowance of alimony said at p. 316 of the last mentioned report:

''But this does not mean that, if the husband have no present estate, his wife shall not be entitled to alimony. His contemplated probable earnings may be the basis for such allowance. *Canine v. Canine,* 16 S. W. 367, 13 Ky. Law Rep. 124. Nor do we perceive why, if probable earnings, as a reasonable expectation, may properly be considered, probable accretions of wealth from any other source may not also be considered. . . . It is not essential that the husband should own the fee-simple title to the land in order to have the value of his interest considered in fixing alimony.''

In view of defendant's vested interest in the Arkansas property and the amount of his prospective in-

come from same, commencing in November, 1939, surely the allowance of $75 a month for his wife's support and $600 for her solicitor's fees, payable at the rate of $50 a month, was neither excessive nor unreasonable.

No objection having been raised in the trial court as to the extent of plaintiff's attorney's services or as to the reasonableness of the fees allowed for same, it cannot be urged for the first time in this court that such fees are excessive. In any event, it cannot be said that the chancellor abused his discretion in allowing either the support or solicitor's fees in the amounts ordered.

As to defendant's contention that "before a party can be held in contempt of court for failure to pay money it must be shown that the party commanded to pay has the ability to comply and has willfully refused to do," it is sufficient to say that the financial condition and circumstances of defendant were exactly the same when the order of December 20, 1937, was entered holding him in contempt as they were when the decree was entered, that defendant had an estate in property upon which he could have realized money to meet his obligations under the decree and under the order of December 20, 1937, and that he deliberately and willfully refused to so do.

The motion heretofore made by plaintiff appellee and reserved to hearing to strike the abstract filed by defendant appellant is now denied.

For the reasons stated herein the decree of the superior court and its order of December 20, 1937, committing defendant to the county jail for contempt are affirmed.

*Decree and order affirmed.*

FRIEND, P. J., and BURKE, J., concur.